# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-0215V

| | |
|---|---|
| SARAH CRITTENDEN, | Chief Special Master Corcoran |
| Petitioner, | Filed: November 21, 2024 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Bridget Corridon, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION DISMISSING PETITION[1]

On January 7, 2021, Sarah Crittenden filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), which she amended on September 20, 2022. Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on October 16, 2020. Amended Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Respondent argues that Petitioner cannot meet the statutory severity requirement, and the matter is now fully briefed. *See* ECF Nos. 30, 31, 36, and 37. For the reasons discussed below, I find that Respondent's objection is meritorious, and therefore the case is dismissed.

**I.     Legal Standards**

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master "may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Section 13(a)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Human Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[3] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner must demonstrate that they:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

Section 11(c)(1)(D).

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five month mark).

Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## II. Relevant Factual History

### A. Medical Records

Petitioner received the vaccine alleged as causal in her left deltoid on October 16, 2020, during an appointment with Dr. Debbie Goodman to follow up on unrelated medical concerns. Ex. 1; Ex. 2 at 21. She was advised to return in six months for an annual exam, but it does not appear that she did so. Ex. 2 at 23.

Less than four weeks after vaccination (November 11, 2020), Petitioner saw Dr. Lynn Chung at an urgent care clinic complaining of left arm pain that she reported began two weeks earlier after a vaccination on either October 16th or 17th. Ex. 3 at 10. Her arm was sore for the first 48 hours after vaccination, then worsened. *Id.* On examination, her range of motion ("ROM") was limited due to pain, and she had mild tenderness on palpation of the subacromial area. *Id.* at 11. Abduction was painful at 60 to 80 degrees, and forward flexion was normal, with normal rotator cuff strength and positive Hawkins impingement testing. *Id.* X-rays were negative. *Id.* Petitioner was assessed with adhesive capsulitis, given exercises to do at home, and advised to take ibuprofen and follow up with an orthopedist. *Id.*

Five days later (and now one month after vaccination (November 16, 2020)), Petitioner saw orthopedist Dr. Edmond Cleeman. Ex. 4 at 4. She complained of moderate and intermittent left shoulder pain that was worse with activities that involved lifting her arm overhead. *Id.* The pain radiated to her deltoid, and was disrupting her sleep. *Id.* Her symptoms had started after a vaccination about four weeks earlier. *Id.* She reported "some improvement in her symptoms." *Id.* On examination, her left shoulder ROM was 160 degrees in forward elevation and 40 degrees in external rotation, and her supraspinatus and infraspinatus strength were four out of five. *Id.* at 5. She had bicep tenderness and positive Hawkins impingement test results. *Id.* An ultrasound of her left shoulder showed that her rotator cuff was intact. *Id.* Dr. Cleeman assessed Petitioner with bursitis of the left shoulder. *Id.* Petitioner was advised to modify her activities, use ice, attend physical therapy, do home exercises, and follow up after an MRI to evaluate damage/tearing of the deltoid. *Id.* at 6.

Thereafter, there are significant gaps in Petitioner's treatment history. For example, Petitioner received COVID-19 vaccines on January 21 and February 18, 2021. Ex. 7 at 1. But at no time in this period did she complain again to any treater of shoulder pain. Indeed, she did not again raise the subject until August 9, 2021 – over eight months after her last appointment for shoulder pain, and seven months after this Petition was filed – when she returned to Dr. Cleeman complaining of left shoulder pain. Ex. 5 at 1.

This record states that Petitioner "return[ed] reporting that she was not able to obtain an MRI because of Corona virus." Ex. 5 at 1. She complained of "intermittent dull, burning pain mostly around her scapula" and "pain with certain exercises and activities." *Id.* On examination, her left shoulder exhibited full ROM with mild pain, and her left shoulder strength was five out of five. *Id.* Dr. Cleeman assessed Petitioner with strain of unspecified muscle, fascia and tendon of her shoulder and upper arm and scapular dyskinesia. *Id.* He again recommended activity modification, icing, and physical therapy. *Id.* at 2. No further medical records have been filed.

### B. Declarations

Petitioner filed three declarations in support of the Petition.[4] Exs. 6, 8, 9. Petitioner asserts that when the vaccine was administered in October 2020, right away she "felt as though something was wrong." Ex. 6 at ¶ 2. She immediately felt a sharp pain that was "much more severe than the normal soreness I have experienced from vaccinations." *Id.* Over the next few days, her pain rapidly intensified and began to interfere with her work, daily routines, and sleep. *Id.* at ¶ 3. She works as a school librarian, and was unable to perform tasks like moving books or even reaching up to put things away on shelves. *Id.* Typing became painful, and she stopped going on walks due to the pain of trying to put on a coat. *Id.* She could not do basic household chores or cook. *Id.*

After a few weeks, Petitioner could "barely move" and went to urgent care, where she was referred to an orthopedist. Ex. 6 at ¶ 4. Dr. Cleeman recommended an MRI. *Id.* Petitioner "tried to schedule the MRI immediately but had to wait for insurance to authorize it." *Id.* While awaiting that authorization, she asserts that "New York City schools shut down again and more restrictions were put back into place due to a serious uptick in COVID cases in the city." *Id.* She asserts that non-emergent medical appointments were "put on the back burner again" and she was not able to schedule the MRI for this reason. *Id.* She adds that this was before anyone was vaccinated, and her partner (with whom she lives) has comorbidities that increased his risk of serious illness if he got COVID. *Id.* She explains that "[t]he prospect of going to a medical facility and possibly exposing my loved ones to COVID was terrifying to me." *Id.*

---

[4] Although Petitioner labeled Exhibits 6, 8, and 9 as affidavits, they are not notarized. Nonetheless, they are acceptable as declarations because they comply with the requirements of 28 U.S.C. §1746.

6

Petitioner continued to hope that the pain would subside on its own, and "after several months it shifted from an intense pain to a duller but persistent, burning pain, which continues to this day" (as of March 17, 2022, when this declaration was signed). Ex. 6 at ¶ 5. She adds that she still experiences "a daily persistent burning pain" in her shoulder, with occasional intense pain. *Id.* at ¶ 6.

In a supplemental declaration signed on November 1, 2023, Petitioner states that she has been in pain since her October 2020 vaccination, and that the COVID-19 Pandemic "seriously impacted [her] ability to seek" treatment that she otherwise desired. Ex. 8 at ¶ 1. During the period of October 2020 to August 2021, she lived in New York City and worked as a teacher/librarian for the New York City Department of Education, *Id.* at ¶ 2. The city was "hit very hard" by the Pandemic, and "it was a scary place to be at that time." *Id.* Petitioner relates hearing "nonstop sirens," and the news being "flooded with daily counts of new infections and daily death tolls." *Id.* She was "terrified of getting COVID and getting very sick and of exposing loved ones to COVID." *Id.*

The initial pain from her injury was extreme enough for Petitioner to overcome her fear of COVID and seek care. Ex. 8 at ¶ 3. However, while waiting for insurance authorization for the MRI ordered by her orthopedist, "New York City shut down again." *Id.* There were "constant warnings from local government and from the media to limit all nonessential activity and quite frankly the idea of going to an urgent care clinic, a hospital, or a doctor's office unless it was life or death seemed foolish." *Id.* at ¶ 4. She worried about putting her partner and other family members with comorbidities, and herself, at risk. *Id.* Due to her job she was able to get vaccinated against COVID relatively early, but because her partner, family members, and friends were not, she still worried that seeking care would put them at risk. *Id.*

Petitioner did not consider telehealth visits because she believed that an orthopedic injury – and especially an MRI – would require in person care. Ex. 8 at ¶ 5. She did not expect anything from telehealth visits beyond pain medication, and she was not interested in simply masking the pain from her injury. *Id.*

During the 2020-21 school year, many of Petitioner's colleagues had medical exemptions from going into the school building, while Petitioner did not.[5] Ex. 8 at ¶ 6. This resulted in a stressful work environment and "extreme pressure" not to miss work for any reason. *Id.* "There were so few teachers going into the building that even one person missing from the building had a huge impact on our ability to follow guidelines around social distancing and other COVID safety precautions in the classroom." *Id.* She states that it was so extreme that her principal told her in March 2021 that "he was unsure if he

---

[5] Petitioner states that she was "one of only 35 or so staff members out of about 140 who did not have a medically-related exemption . . . for going into the school building and working in person with students." Ex. 8 at ¶ 6.

7

would approve my leave to go to my brother's wedding in September of 2021." *Id.* She was required to complete a daily health screening and report any exposure to COVID, and was asked by school administration to limit any potential exposures outside of school. *Id.* She explains that all of these factors affected her decision not to seek further care for her shoulder. *Id.*

During the first few months of the shoulder injury, Petitioner would involuntarily gasp in pain if she moved her shoulder the wrong way. Ex. 8 at ¶ 7. She recalls having difficulty with a wide variety of daily tasks such as washing her hair, putting on deodorant, putting away dishes, and cleaning. *Id.* For the holidays, she and her partner drove to Florida to spend time with family, but she was "in so much pain I could not turn my body to talk to him in the car while I was buckled in." *Id.* She could not cook holiday dinners. *Id.* She was in a lot of pain at night, every night for the first several months and then off and on through the end of 2021. *Id.* at ¶ 8. Her shoulder pain made driving difficult, and she was unable to lift boxes of books or reach into the book drop while working in the school library. *Id.* at ¶ 9.

Petitioner's partner, George Kantor, also filed a declaration in support of her claim. Ex. 9. They lived together, and he recalls Petitioner experiencing pain in October 2020, immediately after vaccination. *Id.* at ¶ 2. Around the time Petitioner saw an orthopedist in mid-November 2020, Mr. Kantor recalls Petitioner often being unable to sleep – which also impacted his sleep – and unable to perform daily tasks. *Id.* Mr. Kantor often had to help Petitioner dress and remove her shirt. *Id.* She was unable to lift or play with their dogs, clean, or food shop without assistance. *Id.*

After the orthopedist appointment, Mr. Kantor recalls that Petitioner was advised to proceed with a scan (MRI), but "the environment in NYC due to COVID forced her to decide whether to expose herself in a medical facility setting, or deal with the intense pain she was experiencing." Ex. 9 at ¶ 3. He adds that appointments were "difficult to come by." *Id.*

Mr. Kantor explains that he has medical conditions which are associated with an increased risk of severe COVID. Ex. 9 at ¶ 4. He and Petitioner did not feel that the New York City schools (where Petitioner worked) provided a safe environment, and "[t]his fear was substantiated and exacerbated as the NYC School System shut down in November of 2020 through March of 2021." *Id.* Petitioner was advised to seek an MRI on November 16, 2020; and "[s]chools were closed for Thanksgiving a week later and then following Thanksgiving indefinitely." *Id.* He adds that this closure had been anticipated prior to Thanksgiving break, which was "just a few days after Sarah's appointment." *Id.* "This shutdown and the subsequent fear it created, in part, informed Sarah's decision not to proceed with an MRI in November and early December." *Id.* Because an MRI could not be done via telehealth, they decided to wait and see what happened with COVID and vaccines for it. *Id.* at ¶ 5.

Petitioner and Mr. Kantor decided to visit Petitioner's family in Florida in the winter of 2020, "necessitat[ing] a quarantine prior to the last two weeks of December . . . further contributing to our decision not to expose ourselves with hospital visits or in person medical procedures." Ex. 9 at ¶ 6. Because Petitioner could not drive, load, or unload the car, or walk their dogs without severe pain, Mr. Kantor did all of those things. *Id*. They returned home in early January, and "were also required to quarantine. This precluded our ability to make appointments in early January." *Id*.

Mr. Kantor relates that [t]hrough January, February, and most of March [2021], NYC was still shut down." Ex. 9 at ¶ 7. It was "too dangerous for children to go to school and for me or Sarah to go to work." *Id*. In those circumstances, Petitioner and Mr. Kantor deemed it "too dangerous for Sarah to begin the arduous process of getting an MRI and proceeding with surgery, or physical therapy, or whatever might come when the risk of COVID was so great. We knew the MRI exposure would be the first of many." *Id*.

Mr. Kantor states that in March of 2021, Petitioner was required to return to school, which "necessitated another quarantine, and recreated a persistent unsafe situation for us." Ex. 9 at ¶ 8. They had decided that the subway was too risky and that Petitioner should drive to work. *Id*. They purchased a "SmartCar to create a safer environment for ourselves." *Id*. at ¶ 9. However, Petitioner was unable to properly operate a car due to pain, and thus Mr. Kantor often drove her to work. *Id*. He states that her pain continued through May of 2021, and came and went between May and August. *Id*. He states, "I know I drove her to school on March 23rd, April 6th, April 8th, April 13th, April 15th, April 20th, April 22nd, April 23rd, April 27th, April 29th, May 4th, May 6th, May 7th, May 11th, and June 11th" – although he does not explain how he is able to recall driving her on these specific dates two and a half years later when he signed his declaration on November 1, 2023. *Id*. He adds that Petitioner was only required to be at school in person on Tuesdays, Thursdays, and most Fridays, so "this is almost every school day between March and May in 2021." *Id*.

Mr. Kantor adds that Petitioner's injury had a "major impact" on him. Ex. 9 at ¶ 10. Because Petitioner was not able to safely drive or hold onto bard or straps on subways or buses, he spent "upwards of 4 hours a day chauffeuring her to and from school," while working full time. *Id*. While his job is flexible, this required him to work late three times a week. *Id*. By contrast, although Petitioner had the right to take sick days, "this was not without consequence." Ex. 9 at ¶ 11. Administrators "were known to 'make life difficult' for those who did not go out of their way to overperform or 'cooperate,'" – and since many faculty had medical exemptions, "it was made clear to Sarah that the school needed all of the in person staff that they could manage and anything less than full attendance would be seen as uncooperative." *Id*.

Petitioner "requested days off to attend [her brother's September 2021 wedding] in January of 2021, but her school's administrator refused to approve or deny the days,

instead implying that her performance and cooperation via attendance throughout the year would contribute to his decision, which he would make in August (days before the wedding)." Ex. 9 at ¶ 12. With "the fear of retaliation present in her mind on a daily basis, Sarah was unwilling to risk an approval to attend her brother's wedding by requesting days off for an MRI appointment that her principal may not see as urgent, or by potentially contracting COVID and eliminating her ability to attend in person." *Id.* In July 2021, they reconsidered further treatment, and she scheduled her August 2021 orthopedist appointment. *Id.* at ¶ 13.

Thus, Mr. Kantor states, "[t]hrough the first half of 2021, Sarah and I retained the perception that adding risk to our lives was unwise." Ex. 9 at ¶ 14. Schools were "unsafe and mismanaged, and students were not always informed on how to keep clean, so they were seen by us as an exceptional risk." *Id.* Adding a trip to a medical facility was "frightening, and often impossible due to appointment availability." *Id.* They were "just trying to keep ourselves safe and our heads above water" and in the surrounding environment "shoulder pain, even significant, was not worth the risks associated with an MRI and follow-ups in medical settings, or a risk to Sarah's job and ability to attend her brother's wedding." *Id.* Mr. Kantor adds a "timeline summary' indicating that Petitioner experienced severe and debilitating pain from October to December 2020; severe pain from January to March 2021; and in April 2021 "[p]ain severe enough necessitating George to drive Sarah to school." *Id.* at ¶ 15.

### III.   Parties' Arguments

Respondent argues that the Petition should be dismissed because Ms. Crittenden has failed to demonstrate that she experienced sequelae of her alleged SIRVA for more than six months after vaccination.[6] Respondent's Motion to Dismiss and Rule 4(c) Report, filed Aug. 28, 2023, at *5-7 (ECF Nos. 30, 31) ("Mot.").[7] Although Petitioner was seen twice for shoulder pain in the first month after vaccination, at the last appointment she reported that her symptoms were improving. Mot. at *6. She subsequently did not seek care again for almost nine months – and over seven months after filing this Petition – at which point her left shoulder had full ROM and normal strength. *Id.* at *6-7. Additionally, her pain was mostly around her scapula and impacted only certain exercises and

---

[6] Respondent acknowledges that the medical records support a finding that Petitioner's pain began within 48 hours of vaccination, and was limited to the shoulder in which the vaccine was administered. He also accepts that she had no history of shoulder pain that would explain her post-vaccination symptoms, and no other condition or abnormality has been identified that would explain her shoulder pain. Mot. at *5.

[7] Respondent's arguments concerning dismissal were included in his Rule 4(c) Report rather than the motion to dismiss; thus, references to page numbers in "Mot." herein refer to pages in the Rule 4(c) Report, ECF No. 30.

activities, and Dr. Cleeman made a non-SIRVA diagnosis – unspecified muscle strain and scapular dyskinesia. *Id.* at *7.

Petitioner asserts that the nine-month gap was due to fear of going to a medical facility, but Respondent argues that she has not provided an explanation for why she did not complain of, or seek an alternative form of care for, shoulder pain during this time. Mot. at *6. Respondent emphasizes that there are *no* records of intervening calls, emails, telehealth visits, or other communication with Petitioner's primary care physician or orthopedist about ongoing shoulder pain. *Id.* Additionally, in November 2020 Petitioner was advised to start a home exercise program, but has provided no evidence documenting that she did so between November 2020 and August 2021. *Id.*

Finally, Respondent suggests that the August 2021 follow-up visit should be given little weight because it occurred over seven months after Petitioner filed this Petition. Mot. at *6 (citing *Milik v. Sec'y of Health & Human Servs.*, No. 01-64V, 2014 WL 6488735 at *12 n.16 (Fed. Cl. Spec. Mstr. Oct. 29, 2014) and *Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. (Oct. 11, 2013), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014)).

Petitioner rejects these contentions. She argues that Respondent effectively asks that I "disregard the record of petitioner's August 9, 2021 visit to Orthopedist Dr. Cleeman for treatment of ongoing left shoulder pain." Petitioner's Response to Motion to Dismiss, filed Nov. 16, 2023, at *4 (ECF No. 36) ("Opp."). Because that visit occurred more than nine months after vaccination, Petitioner implies that it satisfies the severity requirement, requiring a ruling in her favor. Opp. at *4.

Petitioner further disagrees with Respondent's suggestion that distinctions between the November 2020 and August 2021 orthopedist records suggest that Petitioner had an "entirely different condition" at the later appointment. Opp. at *4-5. Instead, Petitioner argues, she "had an ongoing, rather than uniquely new left shoulder condition on August 9, 2021." *Id.* at *5. Petitioner emphasizes that the August 2021 record notes that she "**returns** reporting that **she was not able to obtain an MRI because of Corona virus**" – arguing that the fact that Dr. Cleeman described her visit as a "return" demonstrates that this was a follow up appointment. *Id.* (citing Ex. 5 at 1 (emphases added by Petitioner)). Petitioner adds that there is nothing in the August 2021 record suggesting any new cause of her left shoulder pain, and any suggestion that her pain was caused by anything unrelated is speculative. *Id.*

Petitioner also argues that Dr. Cleeman's August 2021 record was not created as a litigation tool but is a legitimate medical record reflecting Petitioner's ongoing left shoulder condition on that date - distinguishing this situation from *Milik*, where a doctor wrote a letter attempting to contradict an earlier medical record. Opp. at *5-6. And Petitioner also distinguishes this case from *Gerami*, where there were no treatment records beyond three months. *Id.* at *6.

Finally, Petitioner asserts that at the time of Petitioner's November 2020 medical visits, "the nation was entering . . . the 'darkest days of the pandemic,'" which the director of the Center of Infectious Disease Research and Policy of the University of Minnesota described as "Covid hell." Opp. at *7 (citing November 2020 news articles from CNBC and the Washington Post). Petitioner argues that she "should not be punished because she had the misfortune of suffering SIRVA at an inopportune time in history when the city in which she lived was one of the nation's most severely impacted hotspots of a deadly pandemic." *Id.* at *8. Her precautions "were entirely justifiable and in no way diminish the pain and suffering she endured over an extended period of time as a result of her vaccine-related injury." *Id.*

In reply, Respondent confirms that he has reviewed Petitioner's newly-filed evidence (Exhibits 7, 8, and 9), and maintains his position that the Petition should be dismissed. Respondent's Reply, filed Nov. 21, 2023, at *1 (ECF No. 37) ("Reply"). Respondent emphasizes that Exhibits 8 and 9 (declarations from Petitioner and her partner) were prepared for the purpose of litigation nearly three years after the vaccination at issue, and should be given little weight. Reply at *2 (citing *Kohl v. Sec'y of Health & Human Servs.*, No. 16-748V, 2022 WL 4127217 (Fed. Cl. Spec. Mstr. Aug. 18, 2022); *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993)).

Respondent adds that these newly-filed declarations offer no persuasive evidence or explanation for the gap in care. Reply at *2. Respondent notes that Petitioner asserts she did not schedule medical appointments due to caution in the face of the Pandemic – but the declarations show that Petitioner traveled from New York to Florida during this time. *Id.* And Respondent notes that Petitioner had three separate medical appointments at different facilities between October 16 and November 16, 2020, which is not consistent with Petitioner's assertion that she was reluctant to go to a medical facility during this time (since the Pandemic was occurring around the time of vaccination as well as later on). *Id.* Furthermore, Petitioner received *two* doses of the COVID vaccine – greatly reducing her risk of severe illness – by mid-February 2021. *Id.* at *3.

In addition, Respondent reasons, the newly-filed declarations contradict the contemporaneous medical records, casting doubt on the former's reliability. Reply at *3. For example, at Petitioner's November 16, 2020 appointment, she reported an improvement in pain, with only an intermittent throbbing. *Id.* (citing Ex. 4 at 4). However, her partner now states in his declaration that Petitioner was experiencing severe, debilitating pain in November 2020. *Id.* (citing Ex. 9 at 3). And Petitioner described her pain in the first few months as "extreme" – but medical records do not reflect that she reported this to treating physicians at the time. *Id.* (citing Ex. 8 at 2).

Respondent concludes by representing that the objective medical records do not demonstrate by preponderant evidence that Petitioner suffered from residual effects of her injury for more than six months. Reply at *3. Respondent reiterates that at Petitioner's

August 2021 visit to Dr. Cleeman – over seven months after this Petition was filed – it appeared her SIRVA symptoms had resolved, she had full ROM and normal strength, and her pain was located mostly around her scapula, only impacting some exercises and activities. *Id.* There was no lingering injury at that time that had persisted for more than six months post-onset.

## Analysis

A thorough review of the record reveals that Petitioner cannot establish that any SIRVA injury she otherwise may have incurred persisted for over six months - and thus the statutory severity requirement is unsatisfied.

Petitioner sought care for left shoulder pain twice in the first month after vaccination. At an orthopedist appointment 31 days after vaccination, she reported some improvement in her symptoms, and complained of moderate and intermittent pain. She had an intact rotator cuff, bicep tenderness, some ROM deficits, and reduced strength. This evidence supports the conclusion that she likely did experience a SIRVA injury.

Thereafter, however, Petitioner did not seek care for her shoulder pain again for nearly nine months. And when she did return for treatment, she reported pain around her scapula – which is not how she described her pain previously. In addition, she displayed normal ROM and strength, and complained only of intermittent pain, leading treaters to propose extremely conservative measures (activity modification, icing, and physical therapy). And significantly, this appointment occurred during litigation, reducing somewhat its overall probative value (since it can be inferred the visit was aimed at bulwarking this claim as much, if not more than, for treatment of an actual medical concern). *See Watts v. Sec'y of Health & Human Servs.*, No. 17-1494, 2019 WL 4741748, at *7 (treatment record obtained right before filing claim is of "greatly reduce[d] . . . probative value"); *Milik*, 2014 WL 6488735, at 12 n.16 (giving less weight to record created for purposes of litigation).

Thus, the medical records show that Petitioner sought care for just over a month post-vaccination, by which time she reported improving symptoms. After that, however, she did not seek care again for almost nine months, at which time she complained of intermittent pain, which she described differently than before, allowing for the conclusion that the pain and symptoms could have a different source or explanation. *See Mackenzie v. Sec'y of Health & Human Servs.*, No. 21-0637V, 2024 WL 2786793 (Fed. Cl. Spec. Mstr. Apr. 30, 2024) (dismissing claim where the petitioner sought care for less than four months, followed by return to care a year later while in litigation and pain was found to be unrelated); *Hejna v. Sec'y of Health & Human Servs.*, No. 18-1833V, 2022 WL 1210518 (Fed. Cl. Spec. Mstr. Mar. 23, 2022) (dismissing claim where the petitioner sought care

for just over three months with some improvement before stopping treatment due to extenuating circumstances); *Turley v. Sec'y of Health & Human Servs.*, No. 19-1591V, 2021 WL 1660891 (Fed. Cl. Spec. Mstr. Mar. 26, 2021) (dismissing petition for failure to satisfy the severity requirement where the petitioner sought care only twice in the two weeks after vaccination). Accordingly, this record is not preponderantly supportive of the conclusion that Petitioner's SIRVA lasted at least a full six months post-onset.

Petitioner attempts to explain the long treatment gap by pointing to the Pandemic's existence. Certainly in many prior vaccine injury cases, the Program has taken into account the impact of the Pandemic, and why it may have rendered a claimant reluctant, or even unable, to obtain medical treatment (especially in the March to October 2020 timeframe). Moreover, it is undoubtedly true that teachers and school employees like Ms. Crittenden were unquestionably burdened with exceptional demands and forced to balance competing priorities. This is likely even more so for residents of New York City at that time. But I give less weight to Pandemic impacts after the second half of 2020 – especially where, as here, the claimant was not only *vaccinated* in that later timeframe, but even sought some initial urgent treatment for her pain.

Petitioner's declarations are of some help, but are generally inconsistent with her medical records. For instance, Petitioner described her pain as "extreme" in the first few months of her injury, and her partner states that she was experiencing severe, debilitating pain in November 2020 – but her orthopedist documented *moderate and intermittent* shoulder pain that month. Although I recognize that SIRVA symptoms may wax and wane, contemporaneous records under these circumstances deserve more weight than later-created witness statements. *Cucuras*, 93 F.2d at 1528; *Lowrie*, 2005 WL 6117475, at *20.

As to the matter at hand – whether Petitioner experienced residual effects for more than six months, or beyond mid-April 2021 – the only testimonial evidence specific to that time period comes from Mr. Kantor, who asserts that he drove Petitioner to school several times spanning this time period because she could not properly drive due to pain. However, Mr. Kantor does not explain how he recalls these specific dates more than two years later. The declarations otherwise provide general testimonial evidence that Petitioner experienced pain, worried about exposure to the COVID-19 virus, and worried about taking time off from work. However, they do not specifically address what symptoms Petitioner experienced in the relevant time period, what impact they had on her, and, importantly, how she and her partner were able to recall these details years later.

## Conclusion

**Petitioner has failed to establish that the statutory severity requirement is satisfied. Accordingly, Respondent's motion to dismiss is GRANTED and this case is DISMISSED for insufficient evidence. The Clerk of Court shall enter judgment accordingly.[8]**

**IT IS SO ORDERED.**

                                          **s/Brian H. Corcoran**
                                          Brian H. Corcoran
                                          Chief Special Master

---

[8] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.